# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CINDY L. KELLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 16-12083-DJC |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

CASPER, J.                                                                    September 10, 2018

## I.      Introduction

Plaintiff Cindy L. Kelley ("Kelley") filed applications for Social Security Disability Income benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA") on September 28, 2011. R. 189, 352-55.[1] Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Kelley brings this action for judicial review of the final decision of Defendant Nancy A. Berryhill,[2] Acting Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge ("ALJ"), denying Kelley's applications for SSDI and SSI benefits. R. 35-66. Kelley has moved for judgment on the pleadings. D. 11. Thereafter, the Commissioner moved to affirm the ALJ's decision. D. 19. For

---

[1] "R." refers to citations to the Administrative Record, filed at D. 7 and D. 17.

[2] Nancy A. Berryhill is Acting Commissioner of the SSA. Pursuant to Fed. R. Civ. P. 25(d), the Court has substituted Nancy A. Berryhill for the previous Acting Commissioner, Carolyn W. Colvin, as Defendant in this suit.

the reasons discussed below, the Court DENIES Kelley's motion for judgment on the pleadings, D. 11, and GRANTS the Commissioner's motion to affirm, D. 19.

## II.     Factual Background

Kelley previously worked as a fast food worker, a fast food manager, a deli cutter/slicer, a cashier and a presser. R. 174-75, 417. Kelley quit her full-time job as a manager at Wendy's in 2007. R. 79, 158. She did not work at all in 2008, but from June 2009 to June 2010, she had a part-time job as a deli slicer. R. 78, 159. As alleged in the complaint, Kelley has not worked since September 20, 2011 due to depression and post-traumatic stress disorder. D. 1 ¶ 4.

## III.     Procedural History

On September 28, 2011, Kelley filed applications for SSDI benefits, asserting that she had been disabled since June 28, 2010. R. 189, 352-55. After an initial review, Kelley's application was denied on January 20, 2012, R. 227, and denied upon reconsideration on June 25, 2012, id. Thereafter, on July 27, 2012, Kelley filed a request for a hearing before an ALJ. R. 258-59. On May 7, 2013, a hearing was held before ALJ Sean Teehan. R. 142-82. At the hearing, Kelley and Christopher K. Wood, a vocational expert ("VE"), testified. Id. At this hearing, Kelley, through her counsel, John Patitucci, amended her alleged onset date to September 20, 2011. R. 145-46. In a post-hearing brief dated May 20, 2013, however, Kelley amended her alleged onset date again to September 1, 2011. R. 39. On May 31, 2013, the ALJ determined that Kelley was not disabled and denied her claims. R. 224-43. Kelley requested review of the ALJ's decision on July 2, 2013. R. 297. After reviewing the administrative record, the Appeals Council granted Kelley's request for review, and on August 25, 2014, vacated the decision of the ALJ and remanded the case for further proceedings. R. 244-48. Kelley subsequently filed applications for SSDI and SSI on January 15, 2015 and February 26, 2015, respectively, which were consolidated with the present

claim.  R. 38.  Kelley also filed a claim for disabled widow's benefits ("DWB") in April 2015.  R. 106.

In its remand order, the Appeals Council directed the ALJ to consider the effects of Kelley's obesity on her ability to function; further evaluate Kelley's mental impairment in accordance with 20 C.F.R. §§ 404.1520a, 416.920a; give further consideration to Kelley's maximum residual functional capacity ("RFC"); if required, re-assess whether Kelley has the capacity to return to any past relevant work, or to make the vocational adjustment to other work that exists in the national economy; and obtain supplemental evidence from the VE to clarify the effects of the assessed limitations on Kelley.  R. 246.  The ALJ held a second hearing on September 17, 2015 covering all the claims for benefits, wherein Kelley and the VE both testified again.  R. 67-101.  On November 4, 2015, the ALJ found that Kelley was not disabled within the meaning of the Social Security Act at any time between September 1, 2011, her amended alleged onset date, through the date of this decision.  R. 35-66.  Kelley requested review of the ALJ's decision on November 18, 2015.  R. 33-34.  The Appeals Council denied review on August 18, 2016, thereby making the ALJ's decision the final decision of the Commissioner.  R. 2-6.

IV.    **Discussion**

A.    <u>**Legal Standards**</u>

1.    *Entitlement to SSDI and SSI*

To be entitled to SSDI and SSI benefits, a claimant must show that he or she has a qualified "disability."  42 U.S.C. § 423(a)(1)(E).  A "disability" under the Social Security Act includes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  <u>Id.</u> §§ 416(i)(1), 423(d)(1)(A);

20 C.F.R. § 404.1505(a).  To qualify as a disabling impairment, the physical or mental impairment must be sufficiently severe such that it renders the claimant unable to engage in any previous work or other "substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step sequential analysis to determine whether a claimant is disabled and thus whether the application for Social Security benefits should be approved.  20 C.F.R. § 416.920(a); see Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  The determination may be concluded at any step of the analysis.  20 C.F.R. § 416.920(a)(4).  First, if the claimant is engaged in substantial gainful work activity, the application is denied.  Id. § 416.920(a)(4)(i). Second, if the claimant does not have, or has not had, within the relevant time period, a severe medically determinable impairment or combination of impairments, the application is denied.  Id. § 416.920(a)(4)(ii).  Third, if the impairment meets the conditions of one of the listed impairments in the Social Security regulations, the application is approved.  Id. § 416.920(a)(4)(iii).  Fourth, where the impairment does not meet the conditions of one of the listed impairments, the Commissioner determines the claimant's RFC.  Id. § 416.920(a)(4)(iv).  If the claimant's RFC is such that he can still perform his past relevant work, the application is denied.  Id.  Fifth, if the claimant, given his RFC, education, work experience and age, is unable to do any other work within the national economy, he is disabled and the application is approved.  Id. § 416.920(a)(4)(v).

2.    *Standard of Review*

This Court may affirm, modify or reverse a decision of the Commissioner.  See 42 U.S.C. § 405(g).  Such judicial review, however, "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater,

172 F.3d 31, 35 (1st Cir. 1999) (citing <u>Manso-Pizarro v. Sec'y of Health & Human Servs.</u>, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)). The ALJ's findings of fact are conclusive and must be upheld by the reviewing court when supported by "substantial evidence," "even if the record arguably could justify a different conclusion." <u>Whitzell v. Astrue</u>, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation mark omitted). Substantial evidence is "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971), and exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion," <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981).

The Court need not conclude that the ALJ's decision was based upon substantial evidence when reached through "ignoring evidence, misapplying the law, or judging matters entrusted to experts." <u>Nguyen</u>, 172 F.3d at 35. If the ALJ made a legal or factual error, this Court may reverse or remand such decision with instructions to consider new material evidence or apply the correct legal standard. <u>See</u> 42 U.S.C. § 405(g); <u>Nguyen</u>, 172 F.3d at 36; <u>Manso-Pizarro</u>, 76 F.3d at 19.

**B.**     <u>**Before the ALJ**</u>

     *1.*    *Medical History Presented to the ALJ*

The ALJ examined extensive evidence regarding Kelley's medical history, including treatment records, assessments and diagnoses. R. 189-994.

         a.     Sarah Miles, MSW, Helenita Hamer, M.D.
                 and Mamta Modhiwala, M.D.

On September 20, 2011, Kelley began treatment with Sarah Miles, a social worker. R. 493-503. Kelley stated that she felt depressed, easily irritated and tired all the time, but was "self-sufficient." R. 497-99. On the same day, Miles filled out an initial psychiatric disorder questionnaire, wherein she described that Kelley reported "feeling tired all of the time, having

difficulties sleeping . . . [and] having images of her father abusing her and her mother." R. 512. Miles also noted that Kelley presented "as restless, talking fast, and impatient," and reported having "difficulties in her interpersonal relationships." Id. Following this initial visit, Miles diagnosed Kelley with depressive disorder and "rule[d] out" post-traumatic stress disorder.[3] R. 503.

At a follow-up meeting on September 27, 2011, Kelley indicated that she and her spouse were "struggling financially" and that she was looking into applying for SSDI benefits, but realized that she was required to meet with a psychiatrist first. R. 490. At a subsequent meeting on October 4, 2011, Kelley reported that she was unable to work due to having "significant irritability with co-workers" and experiencing panic attacks. R. 489. On October 25, 2011, Kelley and Miles discussed Kelley's struggles with not knowing whether she will be found eligible for SSDI. R. 530. Nonetheless, Miles encouraged Kelley to continue working on her coping strategies. Id. During a follow-up on November 1, 2011, Kelley reported that she was continuing to feel "really blahh" and that she had "nothing to look forward to when she wakes up in the morning." R. 528. However, at the same visit, Kelley also stated that she thought she was "less depressed when she was working," but "also felt like she couldn't keep her spouse happy when she was working due to [her] spouse wanting her around all the time." Id.

On a November 30, 2011 visit to Miles, Kelley reported that she understood that her spouse's mental health was affecting her. R. 525. She told Miles that her "spouse mostly spends time doing nothing in the bedroom but doesn't want [her] to go out." Id. Kelley also stated that when she was employed as a manager, she "enjoyed" her work even though it was stressful. Id.

---

[3] A "rule out" diagnosis means that there is evidence that the patient may meet the criteria for that diagnosis, but the doctors need more information to rule it out. Madera v. Colvin, No. 15-30133-MGM, 2016 WL 7331555, at *2 (D. Mass. Dec. 16, 2016).

She believed that once she knew whether she was eligible for SSDI, she would have a "clear plan of what she needs to do." Id. However, on December 16, 2011, Kelley reported to Miles that she had done a lot of thinking about how she wanted to lose weight, and that she was "interested in talking with a personal trainer to determine how much it would cost." R. 523. Kelley believed that she "would feel a lot better if she exercised and lost weight" because then she would feel good and be more motivated to leave her apartment. Id.

Helenita Hamer, M.D., a psychiatrist, evaluated Kelley on January 3, 2012. R. 519-22. A mental status examination of Kelley showed that while her appearance was "within normal limits," she was avoiding eye contact, was overweight, her posture was rigid and tense, her body movements were restless, her behavior was preoccupied and agitated and her speech was rapid. R. 520. Although Hamer found Kelley to be irritable, depressed and sad, she also noted that Kelley's thoughts were normal and logical; she denied having any hallucinations, delusions, or suicidal thoughts; her intellectual functioning appeared normal; and her memory, insight, and judgment were all within normal limits. R. 520-21. Following this visit, Hamer diagnosed Kelley with depressive disorder, post-traumatic stress disorder and "rule out" mood disorder and prescribed Kelley Abilify. R. 521-22. In a follow-up visit with Miles on January 9, 2012, Kelley reported that her spouse was a "major trigger of her feelings of stress, anxiety and irritability," given that he spent all his time cooped up in their bedroom, but "jump[ed] all over [Kelley]," whenever she tried to leave the apartment. R. 567. Kelley further stated that she had "made connections between how her spouse [was] treating her and how her step-father [had] treated her mother," and that she could not "continue to live like this." Id. Kelley assured Miles that she would "focus more on herself and do things that she enjoys doing, like going for walks, whether or not her spouse approve[d]." Id. In her follow-up visit with Miles on January 23, 2012, Kelley

reported that she had gone out with her spouse for coffee and donuts, and that by "not bottling up her feelings of frustration toward her spouse, her depression and anxiety [had] decreased." R. 566. On February 10, 2012, Kelley reported that her mood was improving and that her medication was working. R. 564. She still had images of childhood abuse, but "this [was] not bothering her as much" and she was less irritable. Id.

Around this time, Kelley heard from the SSA that her initial application for benefits had been denied and she requested for a reconsideration. R. 249-51. On February 14, 2012, Miles was "interested to see if [Kelley] may feel up to working again due to improved mood." R. 563. Kelley requested Miles' help in completing paperwork related to her appeal for SSDI benefits. Id. On February 16, 2012, Miles and Hamer wrote a letter stating that Kelley will likely have "difficulties working for at least a year," due to her symptoms. R. 540. On February 27, 2012, Kelley reported that her mood was still improving. R. 561. She said that she had received a letter indicating that she would be receiving money from company shares acquired through a previous job. Id. Her anxiety had decreased and she had started crocheting. Id.

At the March 6, 2012 session, Kelley's mental status examination was entirely normal, she denied having any depression, appeared to be "groomed, cooperative [and] coherent" and reported that she did not feel as "edgy as before." R. 558. On March 26, 2012, Miles noted that Kelley's mood was generally stable and that she expressed an intention to exercise regularly. R. 556. On May 9, 2012, Miles and Hamer completed a Psychiatric/Psychological Impairment Questionnaire, where they noted that although Kelley reported responding well to treatment and medications, she stated that "she feels this would not be the case in a work situation." R. 597. Miles and Hamer

also assigned Kelley a Global Assessment of Functioning ("GAF") score of 55.[4]  Id.  Miles and Hamer noted that Kelley's primary symptoms at this time were irritability, mood swings, feeling like a "heavy load is on her" and intrusive thoughts and images regarding past traumas.  R. 599. They opined that Kelley was markedly limited in only a few areas:  ability to work in coordination with or proximity to others without being distracted by them; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting.  R. 600-02.

On May 16, 2012, Miles and Hamer completed another psychiatric disorder questionnaire, in which they noted that Kelley had reported "decreased depression and anxiety on current medication," and assessed that her current GAF score was 60.[5]  R. 607.  On May 22, 2012, however, Kelley appeared to be in a "very anxious mood" due to her inability to afford her co-pay for her medication.  R. 617.  Hamer gave her enough samples of Abilify to last a month.  R. 618. On June 13, 2012, Hamer noted that Kelley had "no complaints," but was concerned about a family situation involving her uncle and sister-in-law.  R. 619.  In the same progress note, Hamer stated that Kelley had an "upset" mood and "over productive speech," but was engaged and coherent.  Id.

Mamta Modhiwala, M.D., a psychiatrist, evaluated Kelley on July 11, 2012.  R. 621. Kelley said that she felt "overwhelmed" with her efforts to lose weight and family conflict.  Id. She had not been attending therapy regularly, but wanted to start going twice a month to learn coping skills.  Id.  Modhiwala noted that Kelley appeared "cooperative and friendly," maintained

---

[4] "A GAF score in the 51–60 range indicates moderate symptoms or moderate difficulty in social, occupational or school functioning."  See Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. Text Revision 2000). ("DSM–IV–TR"); see also Stanley v. Colvin, No. 11-cv-10027-DJC, 2014 WL 1281451, at *3 n.3 (D. Mass. Mar. 28, 2014).

[5] See supra n. 3.

"good eye contact," her affect was "reactive [and] appropriate," and her thought process was "linear." Id. Modhiwala diagnosed Kelley with depressive disorder, "rule out" mood disorder and post-traumatic stress disorder and assessed a GAF score of 50.[6] R. 622. In a follow-up visit to Miles on July 24, 2012, Kelley reported that she was "back to feeling nervous," and felt like she "did not care." R. 624. Miles noted that it was possible that Kelley was reporting significantly worse symptoms "due to being denied SSDI [benefits] and wanting a stronger case." Id. Kelley did not know why her medications were no longer working, but stated that she still enjoyed going to the beach and caring for her grandson. Id. On August 6, 2012, Kelley returned to see Modhiwala and reported "improved mood since last session but continued difficulties sleeping." R. 626. On August 8, 2012, Modhiwala noted that Kelley had said that she was in a "good" mood and was cooperative, friendly and maintained good eye contact during their meeting. R. 627. Kelley saw Modhiwala monthly in September 2012, R. 630, October 2012, R. 633 and November 2012, R. 636, and reported at each of these sessions that she was doing well with her medication and that her mood was "good."

In January 2013, Miles reached out to Kelley, who had not returned for counseling in several months. R. 640. Kelley came to see Miles on February 4, 2013 and reported "doing well and being in a good mood." R. 680. Although she presented as "upbeat, smiling and laughing," Kelley claimed that she felt "unable to work currently due to mood swings and difficulties interacting with other people." Id. Miles "completed a long packet from [Kelley's] disability lawyers with [Kelley's] input." Id. At this meeting, Kelley also said that she thoroughly enjoyed knitting, and that she had recently got her son a video game for Christmas, which she had also

---

[6] A GAF score in the 41–50 range indicates serious symptoms or any serious impairment in social, occupational, or school functioning. See DSM–IV–TR.

been using to exercise.  Id.  On February 25, 2013, Kelley saw Modhiwala and requested her to increase her medication as she was feeling "more anxious."  R. 677.  On February 26, 2013, Kelley saw Miles and reported that she felt "suffocated" by her spouse and that it reminded her of her abusive and controlling step-father.  R. 675.

Although Kelley did not see Miles again for five months, Miles and Modhiwala completed a psychiatric/psychological impairment questionnaire on April 9, 2013.  R. 683.  They noted that Kelley had "long-term chronic mood issues," difficulties with becoming easily irritated, feeling a sense of pressure to get things done and sleep disturbance.  Id.  They opined that Kelley was markedly limited in a number of areas:  ability to remember locations and work-like procedures; ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; and, the ability to travel to unfamiliar places or use public transportation.  R. 686-88.  Miles and Modhiwala also noted that Kelley had headaches resulting from lack of sleep.  R. 689.  They stated that Kelley was incapable of tolerating even "low stress" and would likely need to be absent from work more than three times a month.  R. 689-90.  On May 6, 2013, Miles sent a letter to the Social Security Administration where she clarified that although she previously had concerns that Kelley was "exaggerating her mental health symptoms," she was no longer questioning this and believed that Kelley truly struggled with "inattention, understanding and remembering instructions, reading . . . [and] with being triggered by past traumas."  R. 691.

Miles sent this letter subsequent to a request by Kelley's lawyer to "address" her prior comment about not believing Kelley. R. 147.

> b. Peter Pleasants, M.D.

Peter Pleasants, M.D. has been Kelley's primary care physician since 2010. R. 946. On a September 19, 2011 visit to Pleasants (the day before Kelley first met with Miles), Kelley reported that she "feels depressed" despite being on medication. R. 666. On October 19, 2011, Kelley reported that she felt tired and stressed, but was "still looking [for] work." R. 663. A few months later, on May 7, 2012, Pleasants completed a psychiatric/psychological impairment questionnaire where he diagnosed Kelley with anxiety, bipolar and post-traumatic stress disorder. R. 652. He noted, however, that this information "should all be coming from her counselor and psychiatrist." Id. Despite that, Pleasants stated that Kelley had "marked limitations" in four areas: ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to set realistic goals or make plans independently. R. 654-56. He finally noted that Kelley was incapable of tolerating even "low stress" and would likely need to be absent from work more than three times a month. R. 657-58. Pleasants next saw Kelley on February 12, 2014 for a physical. R. 738. He noted that Kelley was "doing better" and was working with counseling and attending group sessions regularly. Id. In a follow-up meeting on July 22, 2015, Pleasants noted that Kelley had recently been in the emergency room with "worsening of her anxiety and bipolar" disorders, and had briefly attended a partial hospitalization program for the same symptoms. R. 942. He did state, however, that Kelley appeared to "interact[] well . . . [and was] mildly anxious."

R. 943. On August 2, 2015, Pleasants signed a letter restating the contents of the questionnaire he had filled out almost three years ago. R. 946.

c.      Other Medical Opinions

Michael D. Williams, Ph.D., evaluated Kelley on the referral of Miles on July 15, 2013. R. 692. He reported that Kelley appeared "mildly overtly anxious, restless and cooperative," but at times she worked through the tasks "a bit too quickly and struggled to adequately attend and concentrate." R. 693. In his observations, Williams stated that Kelley was last employed in 2005. R. 697. Williams administered a number of tests, and summarized that Kelley's overall cognitive reasoning abilities fell within the borderline range, with comparably developed verbal and non-verbal reasoning abilities. Id. Furthermore, on measures of achievement, she obtained below average scores. Id. Williams stated that based on Kelley's "self-report" and personality testing results, she was overwhelmed by her own emotions, thoughts and experiences. Id. She lacked the skills required to provide herself with symptomatic relief and thus, she should be referred to an "inpatient or day treatment program." Id. Williams diagnosed Kelley with post-traumatic stress disorder, dysthymic disorder, learning disorder, "rule out" major depressive disorder versus bipolar II disorder and "rule out" ADHD. R. 698. He also noted that Kelley's performance on personality and emotional functioning tests could be read to show a psychotic level of disturbance, but he was "much more inclined to suspect that these 'findings' overstate her symptomatology from a diagnostic standpoint." R. 696.

On August 19, 2013, Fiona Moore, a social worker, evaluated Kelley. R. 700. She observed that Kelley's psychosocial stressors include significant "financial stress," and that her current symptoms of depression include "depressed mood, low energy, lack of interest in activities, amotivation, disturbed sleep and poor self-esteem." Id. Moore also conducted a mental status

examination, which revealed that Kelley's posture was rigid and tense, her facial expression suggested depression and sadness and that her mood was anxious, fearful and apprehensive. R. 704-06. Moore did not find that Kelley was impaired in her movements, speech, rapport, attention span, intelligence, memory, insight, thought content, perception and affect. Id. Moore diagnosed Kelley with dysthymic disorder, post-traumatic stress disorder, learning disorder, "rule out" ADHD and borderline intellectual functioning. R. 706. She recommended the structure and support of a day treatment. R. 707.

Kelley went in for counseling at a day treatment program multiple times between August 20, 2013 and January 30, 2015. R. 711-22, 759-830, 870-83. Mental status examinations during this period revealed a number of conflicting findings: Kelley appeared to be oriented, attentive, displaying appropriate appearance, good judgment and some insight, but was also anxious and depressed. R. 712. In September and October 2013, Kelley reported that learning skills had been very helpful in coping with her anxiety and depression and that she had found her symptoms to be more manageable. R. 718, 720, 722. In November 2013, Kelley's insurance was discontinued due to problems with the paperwork. R. 762. She was unable to attend counseling sessions until January 2014, when despite feeling anxious and depressed, she had an appropriate appearance, good judgment, good insight, appropriate affect, and was attentive, oriented and goal-directed. R. 770. At a January 31, 2014 visit, however, Kelley appeared to be "withdrawn." R. 772. Other mental status examinations between January 2014 and January 2015 revealed limited improvement in Kelley's status. R. 778, 780, 782, 784, 786, 788, 790, 792, 804, 808, 810, 814, 816, 818, 820, 822, 824, 830, 871, 873, 875, 877.

On October 30, 2013, Kelley had a consultation with Darlene Gustavson, Psy.D. R. 723. Kelley explained that she was applying for disability benefits due to post-traumatic stress disorder,

depression, and learning difficulties. Id. She reported that she had last worked in 2010 because her husband had a heart attack and she had to quit to take care of him. R. 724. Kelley shared the story of her childhood abuse and that she experienced daily flashbacks, which made her tense and nervous. R. 723. She explained that she did not leave the house except for appointments and that her husband was responsible for doing the grocery shopping in addition to reminding her about her appointments and medication. Id. Kelley, however, did the cooking and cleaning around the house. R. 724. Kelley said that she had learned coping skills such as breathing and meditation, and that she had been able to sometimes use these skills effectively. Id. Regarding her learning difficulties, Kelley explained that she needed help with paying bills since she was disorganized. Id. She, however, was able to follow directions and could drive without assistance to familiar locations. Id. Gustavson conducted a mental status examination of Kelley and observed that she was "well-groomed," and was able to cooperatively participate in a sixty-minute interview without complaints. R. 725. Kelley's mood was "bright," and she "smiled and laughed at appropriate times during the interview." Id. Furthermore, Kelley's thought process was logical and directed, her thought content was normal and her judgment and insight were intact. Id. Her intellectual functioning was still estimated to be in the borderline range based on a recent intellectual evaluation. R. 726. In Gustavson's opinion, Kelley was able to attend to personal affairs such as scheduling and attending appointments; she was able to attend to personal tasks such as grooming, cooking and cleaning; she was able to communicate with her family, but was unable to interact with supervisors or coworkers due to irritability, and lacked motivation to initiate and engage in friendships; she was able to understand and remember simple instructions, but was unable to consistently understand and remember detailed instructions; she was unable to maintain concentration and attention to complete tasks consistently, but was able to make simple decisions

and maintain a schedule.  R. 726-27.  Gustavson diagnosed Kelley with chronic post-traumatic stress disorder, dysthymic disorder, borderline intellectual functioning and personality disorder with borderline traits.  R. 727.

On November 4, 2013, Gustavson completed a psychiatric/psychological impairment questionnaire for Kelley.  R. 729.  Her prognosis was "fair to good" as Kelley was "motivated and able to engage in treatment."  Id.  She noted that Kelley's primary symptoms were emotional lability, hostility and anger triggered by PTSD, fear of failure and being judged negatively, flashbacks, nightmares, hypervigilance, isolation, difficulty concentrating and limited comprehension.  R. 731.  Gustavson opined that Kelley was markedly limited in several areas:  the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; the ability to travel to unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently.  R. 732-34.  Gustavson summarized that Kelley was incapable of tolerating even "low stress" and would likely need to be absent from work more than three times a month.  R. 735-36.

On November 21, 2014, Somatra Simpson, R.N., M.S.N. met with Kelley a few days after Kelley's husband passed away.  R. 867.  Simpson reported that Kelley was "tearful, but [was] able to smile."  Id.  Kelley also stated that she felt "lost," but she understood that she would be able to manage without her husband.  Id.  She also denied having suicidal thoughts, manic symptoms or unmanageable anxiety and said that she was able to perform her daily activities without any difficulty.  Id.  On December 19, 2014, Kelley told Simpson that her son overdosed on his psychiatric medicine.  R. 864.  She also reported that "today is the third day in a row" that she had not cried, and she considered this to be a sign of healing.  Id.  She denied having manic symptoms and stated that she was able to perform activities of daily living and self-care without any difficulty.  Id.  At this visit, Kelley also requested Simpson to complete disability paperwork and a mental health questionnaire.  Id.  Simpson completed this questionnaire on December 23, 2014.  R. 831-35.  Simpson diagnosed Kelley with major depressive disorder; post-traumatic stress disorder and dysthymic disorder.  R. 831.  Kelley's clinical signs included, among others, depressed mood, persistent or generalized anxiety, abnormal affect, irritability, mood swings, recurring panic attacks and retardation.  R. 832.  Simpson further opined that Kelley was markedly limited in several areas:  understanding and remembering detailed instruction; carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining ordinary routine without supervision; working in coordination with or near others without being distracted by them; completing a workday without interruptions from psychological symptoms; performing at a consistent pace without rest periods of unreasonable length or frequency; and making plans independently.  R. 834.  Simpson further stated that Kelley was likely to be absent from work more than three times a month as a result of her impairments.  R. 835.  On two follow-up visits on January 16, 2015 and May 11, 2015, Kelley reported to Simpson that although she was crying

17

daily, she was able to perform activities of daily living and self-care without any difficulty.  R. 892, 898.

d.      State Agency Assessments

On January 12, 2012, Kelley underwent a consultative examination with Marnee Colburn, Ph.D.  R. 48, 533-37.  Colburn noted that Kelley appeared to have "low-average intellect," a modest knowledge-bank, adequate short-term memory, moderately impaired long-term memory, poor concentration and poor to fair persistence.  R. 535.  She observed that Kelley "was very quick to give up on tasks," and would likely benefit from additional support.  Id.  Kelley, however, admitted that she drove, went out unaccompanied, went shopping with her husband, cooked simple meals, completed household tasks without difficulty, took care of herself, her 15-year-old son and her husband and occasionally spoke to a friend on the telephone.  R. 536.  Colburn diagnosed Kelley with depressive disorder, post-traumatic stress disorder and obsessive compulsive disorder, and assigned a GAF score of 50.[7]  R. 536-37.  She opined that Kelley came from an abusive background and "clearly had symptoms of PTSD most of her life."  R. 537.  Furthermore, she noted that Kelley had a "modest intellect," and would "clearly benefit from counselling and help with her PTSD in particular."  Id.  Lastly, Colburn stated that Kelley was "capable of completing simple tasks on her own and understanding and remembering these tasks well," and that Kelley's insight and judgment appear to be fair.  Id.

On January 13, 2012, Kelley underwent a psychiatric evaluation by Sandra Diaz, Ph.D.  R. 201-11.  Diaz diagnosed Kelley with severe affective disorder, severe anxiety disorder and non-severe personality disorder.  R. 206.  She opined that Kelley did not have understanding and memory limitations, but she did have sustained concentration and persistence limitations.  R. 208.

---

[7] See supra n. 5.

18

Kelley's ability to carry out short and simple instructions, however, was not significantly limited, even though her ability to carry out detailed instructions was moderately limited. Id. Diaz also stated that Kelley's ability to interact appropriately with the general public, and her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extreme, was moderately limited. R. 208.

A few months later, on June 7, 2012, Kelley underwent a third evaluation by psychologist, Chivi Kapungu, Ph.D. R. 213-23. After observing Kelley and reviewing her past records, Kapungu concluded that "the evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the [disability] claim." R. 217. She did, however, diagnose Kelley with affective disorder and anxiety disorder, but stated that it did not "precisely satisfy the diagnostic criteria." R. 218. As for the rest of her observations, Kapungu generally agreed with Diaz, but reported that Kelley was doing better at the moment and reporting decreased depression and anxiety due to her current medications. R. 220. In sum, Kapungu opined that Kelley was at minimum able to understand and follow simple instructions, able to carry out simple tasks for two-hour periods during a forty-hour work week, able to manage appropriate interpersonal interactions and was moderately limited in coping with minor changes in work, but was showing improvement with continued therapy and medication. R. 221.

2.    *ALJ Hearing*

The ALJ heard testimony from Kelley and the VE at two hearings on May 7, 2013, R. 142-181, and on September 17, 2015, R. 67-101.

a.    Kelley's Testimony

At the first hearing, Kelley testified that the last time she worked was in 2010, when she was employed at Parker's Meat Market as a deli slicer. R. 151. She stated that the reason she quit was because her husband got sick, but then she stopped working completely because she "couldn't

focus and pay attention" to what she was supposed to be doing. R. 152-53. After resigning, she applied for unemployment benefits in March 2011, where she indicated that she was "ready, willing and able to work." R. 153.

The ALJ asked Kelley to explain in her own words why she felt that she was disabled from performing any work. R. 160. Kelley testified that she was suffering from anxiety, for which Pleasants had prescribed her Prozac and recommended that she attend counseling. R. 161. This is how she met Miles, who Kelley testified was "someone I can open up to." R. 162. Kelley testified about the incident where she "threw a chair" at a co-worker who was "giving [her] lip." R. 168-69. She also explained that her behavior was due to her relationship with her step-father, whose death led her to spiral into deep depression. R. 169. Kelley noted that she was still able to take care of household chores since her "husband [did not] do anything." R. 164. She testified that she cooks, cleans, drives, shops for groceries, visits her mother's house and sometimes visits her friend who lives two miles away. R. 165-67. Upon questioning from her attorney, however, Kelley clarified that she does not cook much, but rather ate microwaveable food. R. 171. Furthermore, she stated that at least twice a week she feels "very down," and in those moments, she likes to be alone and not to be bothered by anyone else. R. 171-72.

At the second hearing on September 17, 2015, Kelley testified that she continued to be able to do household tasks, such as make breakfast for her son, make sure he took his medications for his ADHD, do laundry, clean around the house, cook at times and drive. R. 82-83. She stated that she had stopped seeing her family or visiting her mother since her husband passed away on November 18, 2014. R. 84-85. She noted that her "life is more with Pathways," which she attended regularly for counseling. R. 86-87. She indicated that she still had problems with her anxiety and that it had gotten worse since the last hearing. R. 89-90.

b.      VE's Testimony

At the second hearing on September 17, 2015, the ALJ posed two hypotheticals to the VE. R. 95-99.  First, the ALJ asked the VE to consider an individual "who is of the same age, education, and work background" as Kelley, and further assume that this person would be "able to understand and carry out instructions that would be simple, consistent with an SVP of 2 . . . maintain concentration, persistence, and pace for two-hour increments over an eight-hour workday, over a 40 hour workweek" and would be limited to "deal[ing] with only minor changes in the workplace and would be able to relate to co-workers, supervisors, and the public on a superficial interactional basis."  R. 96-97.  The ALJ asked the VE to opine on whether such a person would be able to perform any of the past jobs held by Kelley.  R. 97.  The VE responded that this individual could perform some of Kelley's past work, including working in a fast food restaurant, and as a deli cutter/slicer.  Id.  The ALJ next asked the VE if there were other jobs that would also be available to such a person.  Id.  The VE responded that this person could work as a cleaner/housekeeper, which is a light and unskilled job.  Id.

The ALJ next posed a second hypothetical to the VE.  R. 98-99.  The ALJ asked the VE to consider an individual who has "marked limitations in understanding and remembering detailed instructions, carrying them out, maintaining attention and concentration for extended periods . . . sustaining an ordinary routine without supervision and work[ing] in coordination with or near others without being distracted by them . . . complet[ing] a workday without interruptions from psychological symptoms, perform[ing] at a consistent pace without rest periods or unreasonable length or frequency, make[ing] plans independently . . . [and] be[ing] absent from work more than three times per month."  Id.  The ALJ asked the VE to opine whether such a person would be able to perform any work in the regional or national economy.  R. 99.  The VE responded that in this

hypothetical scenario, such an individual would not be able to perform Kelley's past work and there would be no available work for the individual in the economy.  Id.

### 3.    *Findings of the ALJ*

The ALJ followed the five-step analysis.  See 20 C.F.R. § 404.1520.  At step one, the ALJ concluded that Kelley had not engaged in substantial gainful activity since September 1, 2011, her alleged disability onset date.  R. 41.

At step two, the ALJ concluded that Kelley's following impairments were severe:  affective disorders, anxiety-related disorders and borderline intellectual functioning.  Id.  Although not alleged, the ALJ considered Kelley's obesity, hypothyroidism, elevated cholesterol and borderline hypertension, but found that they were not severe.  R. 42.  The ALJ also considered Kelley's borderline personality disorder, but found it to be a non-medically determinable impairment.  Id.  Moreover, the ALJ found that Kelley had not alleged any personality disorder contributing to her disability claim, but still included her mental limitations when determining her RFC.  R. 43.  The ALJ also explained that despite finding some of Kelley's alleged impairments to be non-severe, he would take into account all allegations of symptoms arising from both severe and non-severe impairments when determining her RFC.  Id.

At step 3, the ALJ determined that Kelley did not have an impairment or combination of impairments that met or medically equaled a listing in 20 C.F.R. § 404, Subpart P, Appendix 1.  Id.  Regarding the "paragraph B" criteria for evaluating mental disorders, the ALJ concluded that Kelley's medically determinable impairment caused mild limitations in her ability to do "activities of daily living;" a moderate limitation in the areas of social functioning and concentration, persistence, or pace; and, no limitations involving repeated episodes of decompensation.  R. 43-45.  Since Kelley's impairments did not cause at least two marked limitations or one marked

limitation and repeated episodes of decompensation, the ALJ concluded that the "paragraph B" criteria had not been satisfied. R. 45 (citing 20 C.F.R. §§ 404.1520a (d)(1), 416.920a(d)(1)).

At step four, the ALJ found that Kelley had the RFC to:

> perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to understanding and carrying out instructions that would be simple, consistent with a specific vocational preparation ("SVP") of 2. She is further limited to maintaining concentration, persistence and pace for two hour increments over an eight-hour workday and over a 40-hour workweek. She can deal with only minor changes in the workplace and would be able to relate to coworkers, supervisors, and the public on a superficial, interactional basis.

R. 46. The ALJ found that while Kelley's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible when evaluated in accordance with 20 C.F.R. §§ 404.1529, 416.929 and SSR 96-7P (S.S.A. July 2, 1996). R. 47. In making this determination, the ALJ considered Kelley's own testimony and the third-party function report completed by her late husband on January 9, 2012. Id. The ALJ gave little weight to the following evidence: Miles' September 20, 2011 questionnaire; Miles and Hamer's February 16, 2012 letter, May 9, 2012 letter and May 16, 2012 questionnaire; Miles and Modhiwala's April 9, 2013 evaluation of Kelley; Miles' letter from May 6, 2013 clarifying her treatment notes; Pleasants' evaluation of Kelley in general; Gustavson's October 2013 examination of Kelley; and Simpson's December 23, 2014 questionnaire. R. 53-56. The ALJ did so because he found inconsistencies in the record that shed substantial doubt on the overall reliability of these opinions. In contrast, the ALJ gave great weight to the opinions of Diaz and Kapungu who last evaluated Kelley in 2012. R. 56.

At step 4, based on this RFC assessment and the VE's testimony, the ALJ concluded that Kelley was able to perform her past relevant work as a fast food worker and a deli cutter/slicer. R.

57.  Furthermore, at step 5, the ALJ found that Kelley was also able to perform a number of other jobs existing in the national economy, such as a cleaner/housekeeper, cafeteria attendant and price marker.  R. 57-58.  Accordingly, the ALJ determined that Kelley was not disabled as defined by the Social Security Act.  R. 59.

### C.  Kelley's Challenges to the ALJ's Findings

Kelley seeks reversal of the ALJ's decision, or, in the alternative, remand to the SSA for a new administrative hearing.  D. 12.  Kelley argues that:  (1) the ALJ failed to weigh the medical opinions properly, D. 12 at 18; (2) the ALJ failed to evaluate her credibility properly, id. at 25; and (3) the ALJ relied on flawed vocational expert testimony, id. at 28.

#### 1.  *The ALJ's Weighing of the Medical Evidence*
   *was Supported by Substantial Evidence*

Kelley alleges that the ALJ's weighing of the medical opinions was not supported by substantial evidence because the record does not contain sufficient reasons to discount the testimony of her treating professionals, including Dr. Hamer, Dr. Modhiwala, Dr. Gustavson and Nurse Simpson.  D. 12 at 18-20.

An ALJ must "always consider the medical opinions in [the] case record" to determine if the complainant is disabled.  20 C.F.R. § 404.1527(b).  The ALJ is generally required to give "more weight" to the opinions of treating sources, since these sources are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2).  The ALJ, however, is not required to give the medical opinion of a treating physician controlling weight unless it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the]

case record." 20 C.F.R. § 404.1527(c)(2); see Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375-76 (1st Cir. 1982). Furthermore, the ALJ may "discount the weight given to a treating source opinion where it is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians." Jordan v. Colvin, No. 15-cv-13320-LTS, 2017 WL 262007, at *3 (D. Mass. Jan. 18, 2017); see Arruda v. Barnhart, 314 F. Supp. 2d 52, 71-72 (D. Mass. 2004). To determine how much weight to give any medical opinion, the ALJ may consider the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the medical opinion by medical signs and laboratory findings, the consistency of the opinion, the specialization of the medical opinion provider and other factors. 20 C.F.R. § 404.1527(c).

Although it is "desirable" for the ALJ to analyze each of the factors, the Court will not "remand [the] case so that another [ALJ] may arrive at the same decision with more clarity." Sanchez v. Colvin, 134 F. Supp. 3d 605, 615 (D. Mass. 2015) (quoting Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass. 1998)). The regulations also do not require the ALJ to state expressly how each factor was considered, but they do require the ALJ to provide "good reasons" for his decision to give each treating source's opinion the weight he did and these reasons "must be sufficiently specific to make [it] clear to any subsequent reviewer." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996); see Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015); see also Shields v. Astrue, No. 10–10234–JGD, 2011 WL 1233105, at *8 (D. Mass. Mar. 30, 2011) (stating that "[b]ecause the ALJ supported his rejection of the treating physician's opinions with express references to specific inconsistencies between the opinions and the record, [his] decision not to grant [the treating physician's] opinions significant probative weight was not improper").

In this case, the ALJ gave little weight to the medical opinions of Hamer, Modhiwala, Simpson, Pleasants and Gustavson, on the basis that those opinions were not supported by objective medical evidence and were inconsistent with substantial evidence in the record.  R. 53-56.  For example, the ALJ also gave little weight to therapist Miles' September 20, 2011 questionnaire because it was "rendered after only one visit," and was inconsistent with the overall weight of the evidence that showed that Kelley was only moderately limited in social functioning and concentration, persistence or pace.  R. 53.  The ALJ gave little weight to Miles and Hamer's February 16, 2012 letter because he felt that their statement that Kelley "will have difficulty working for at least one year" was "conclusory without specific functional limitations."  Id.

The ALJ gave little weight to Pleasants' medical opinion for several reasons.  Id.  First, the ALJ noted that although Pleasants was Kelley's primary care physician and had no expertise in psychiatry, he proceeded to provide a psychological evaluation of Kelley.  Id.  Second, the ALJ explained that his treatment notes were inconsistent in that they did not support his opinion, but rather showed that Kelley had improved symptoms in 2011.  Id.  Lastly, the ALJ found that Pleasants' opinions was inconsistent with the overall weight of the evidence, including Kelley's mental status findings and her largely intact activities of daily living.  Id.

The ALJ also gave little weight to Miles and Hamer's May 9, 2012 and May 16, 2012 questionnaires because it appeared that they were completed based upon Kelley's "subjective allegations," which rendered them less probative.  R. 53-54.  The ALJ found that the treatment notes at the time of these opinions showed that Kelley's mood was stable, and that she had no significant abnormalities on her mental status examinations.  R. 54.  The ALJ gave little weight to Miles and Modhiwala's evaluation on April 9, 2013 because he found it to be "inconsistent with

the medical evidence of record, which show[ed] steady improvement with a few dips in mood."
Id.

Finally, the ALJ gave little weight to Gustavson's consultative examination of Kelley in October 2013 because he found Gustavson's opinion on Kelley's marked limitations to be inconsistent with Gustavson's mental status findings. R. 55. Additionally, the ALJ noted that Gustavson performed only one evaluation of Kelley and lacked a treating relationship with her. Id. Lastly, the ALJ gave little weight to Simpson's opinion that Kelley's impairments affected her ability to work for more than one year because it was inconsistent with the overall weight of the evidence, and was rendered shortly after Kelley's husband had passed away. R. 55-56. Thus, the Court cannot find that the ALJ erred in discounting the opinions of the above-mentioned medical providers.

Kelley contends that the ALJ erred in giving little weight to the conclusions of her treating professionals on the basis that those conclusions stemmed from Kelley's self-reported complaints. In support of this argument, Kelley cites to Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir. 1989). D. 12 at 21. However, Blankenship is inapposite. In Blankenship, the Sixth Circuit, in reversing the ALJ's decision, held that objective evidence supporting a claimant's subjective complaints is not necessarily required, especially when the ALJ found "no medical evidence contradicting [the psychiatrist's] conclusion." Id. at 1121. Blankenship, however, does not require an ALJ to ignore objective medical evidence, especially when it conflicts with the claimant's subjective complaints. Unlike the ALJ in Blankenship, the ALJ here found other "inconsistencies in [Kelley's] testimony, or statements to doctors" regarding her mental status. See id. at 1124. These inconsistencies included: evidence that Kelley was actively looking for work while pursuing disability benefits, R. 53, 663; Miles' suggestions that Kelley should consider returning

27

to work due to her improved mood and that Kelley may have exaggerated her symptoms to make a better case for her disability benefits claim, R. 48-49, 563, 624; and the inconsistencies between Kelley's subjective complaints about her mood and mental status and those reflected in the medical providers' treatment notes, see e.g., R. 556, 566, 563, 680.

Kelley also cites to Johnson v. Astrue, 597 F.3d 409, 412 (1st Cir. 2009), in which the court reversed the ALJ's decision to give little weight to a treating expert's opinion where the expert relied on the claimant's subjective allegations. However, in Johnson, the court explained that objective evidence plays a very limited role in a diagnosis of fibromyalgia. Id. For the diagnosis at issue here, the same is not necessarily true. R. 51-52 (explaining that objective evidence from Kelley's mental status examinations undermined the claimed severity of her diagnosis). Thus, the Court concludes that the ALJ's decision to give little weight to the conclusions of Kelley's treating sources because, in part, they were based on Kelley's subjective complaints was supported by substantial evidence in the record. See Rodriguez Pagan, 819 F.2d at 3 (affirming ALJ's decision to discredit opinions from two treating physicians where they "relied excessively on claimant's subjective complaints, rather than objective medical findings"); 20 C.F.R. § 404.1527(c)(3) (explaining that "[t]he more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion").

Kelley next also argues that the ALJ erred in giving probative weight to the reports from non-examining state agency medical consultants because those reports did not reflect the detailed opinions from examining sources who examined Kelley first-hand and were prepared three-and-a-half years before the ALJ's decision. D. 12 at 22; R. 201-11; R. 213-23. The record, however, demonstrates that Diaz and Kapungu both had an opportunity to review all of Kelley's records and

medical opinions up to that point prior to making their assessments. See R. 191-92 (listing evidence of record received and evidence that has been requested), 214-17 (same). The fact that a state agency psychiatrist did not have access to all of Kelley's medical records and opinions does not necessarily prevent the ALJ from assigning significant weight to their assessments as long as the ALJ himself "conducted an independent review of the evidence, which included treatment notes the [state agency psychiatrists] had not considered." Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 137 (D. Mass. 2014) (quoting Carter v. Astrue, 886 F. Supp. 2d 1093, 1112 (N.D. Iowa 2012). The ALJ considered the treatment notes and records from all the medical providers that Kelley had seen since her alleged onset date up to the date of the opinion. See R. 47-56. Accordingly, Kelley has not shown that the record contains insufficient evidence for the ALJ to afford significant weight to the state agency assessments.

Furthermore, Kelley argues that the ALJ erred by concluding that Kelley's period of improvement conflicts with the limitations identified by her treating experts. D. 12 at 21. The ALJ's decision to consider Kelley's positive responses to treatment as another factor in assessing her alleged disability, however, was supported by substantial evidence in the record. See e.g., R. 556, 563, 566. Under the SSA regulations, the ALJ is tasked with weighing the evidence in the record and the ALJ can consider a number of factors to determine what evidence to weigh more significantly. 20 C.F.R. §§ 404.1527(c), 416.927(c); see Martinez-Lopez, 54 F. Supp. 3d at 137-38 (concluding that substantial evidence supported the ALJ's decision to give less weight to a treating expert's opinion because it did not account for the positive effect of the claimant's medication).

Kelley also argues that the ALJ's finding that her daily activities were inconsistent with her alleged disabling limitations was not supported by substantial evidence in the record. D. 12 at

23.  In <u>Johnson</u>, upon which Kelley relies, the claimant's daily activities, which included "light housework, meal preparation and driving short distances," were not necessarily inconsistent with her treating expert's opinion.  D. 12 at 23; <u>Johnson</u>, 597 F.3d at 414.  In Kelley's case, however, the ALJ found that Kelley's ability to drive on occasion; shop; cook simple meals; complete household chores without difficulty; take care of herself, her grandson and her husband; and speak to her family and friends over telephone, was inconsistent with her treating experts' opinions that Kelley was "incapable of handling even low stress."  <u>See</u> R. 164-65, 383-86, 403, 441-44, 536, 657, 689, 735.  Furthermore, Kelley repeatedly expressed a desire to be more active.  <u>See, e.g.</u>, R. 523, 556, 680.  Thus, the Court concludes that the ALJ's decision was supported by substantial evidence in the record.  R. 600-02, 686-88, 732-34, 832-34; <u>see</u> 20 C.F.R. §§ 404.1529(a), (c)(3)(i), 416. 929(a), (c)(3)(i); <u>see also</u> <u>Silvia v. Colvin</u>, No. 13-cv-11681-DJC, 2014 WL 4772210, at *7 (D. Mass. Sept. 22, 2014) (concluding that there was substantial evidence to support the ALJ's adverse credibility determination when claimant's own accounting of his daily activities included "attending to personal care tasks, handling personal finances, regularly watching his daughter, walking or riding the bus and playing video games"); <u>MacNeil v. Astrue</u>, 908 F. Supp. 2d 259, 267 (D. Mass. 2012) (concluding that there was substantial evidence in the record for the ALJ to consider  claimant's ability to "care for her personal hygiene, drive when she has access to a car, shop with her mother and sister and do general cleaning and cooking").

Kelley further contends that the ALJ was not permitted to rely on the GAF scores as a reason to discount her treating experts' testimony.  D. 12 at 23.  The GAF scale provides an estimate of a complainant's "psychological, social and occupational functioning."  <u>Bourinot</u>, 95 F. Supp. 3d at 178 (quoting <u>Vargas v. Lambert</u>, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998)).  Despite concerns about the reliability of the GAF scale, <u>see</u> <u>Bourinot</u>, 95 F. Supp. 3d at 178 (finding that

the ALJ did not err in considering the claimant's GAF scores even though there are significant concerns about the reliability of the GAF scale); D. 12 at 23, the Court does not conclude that the ALJ's reliance on the scores was, as a part of the record as a whole, a reversible error.  The ALJ gave only "some weight" to the GAF scores, and did not consider any one score in isolation.  R. 56 (recognizing that "GAF scores are not determinative of disability because they are only a snapshot of functioning").  Furthermore, the ALJ did not discount the medical opinions based solely on those scores, rather he found that there were other inconsistencies in the record which shed doubt on the extent of Kelley's alleged limitations.  Id.

Finally, Kelley argues that the ALJ erred in properly applying the factors provided in 20 C.F.R. §§ 404.1527, 416.927.  D. 12 at 24.  These factors include:  the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the medical opinion by medical signs and laboratory findings, the consistency of the opinion, and the specialization of the medical opinion provider.  20 C.F.R. § 404.1527(c).  However, this list of factors is "non-exhaustive and presents the quintessential balancing test."  Conte v. McMahon, 472 F. Supp. 2d 39, 48 (D. Mass. 2007).  Kelley is not arguing that the ALJ failed to perform the balancing test, but rather that he chose to stress one factor over another.  Kelley asks this Court to re-weigh the evidence in light of the other factors enumerated above, but, this Court is limited by the standard of review, which only requires that the ALJ's finding be supported by substantial evidence.  See Whitzell, 792 F. Supp. 2d at 148.  The ALJ was allowed to discount the treating physicians' opinions to the extent that they were inconsistent with other parts of her medical records.  The ALJ's decision was primarily motivated by the inconsistencies he noted in Kelley's records.  For example, between September 2011 and November 2012, Kelley reported to have an improved mood, and frequently expressed a seemingly genuine desire to get

better by exercising, going outside, and taking up hobbies such as knitting and crocheting.  See R. 556, 566, 563.  On February 14, 2012, Miles was interested to see if Kelley may feel like working again due to her improved mood.  R. 563.  Despite this, Miles wrote a letter two days later on February 16, 2012 stating that Kelley was likely to have "difficulties working for at least a year" due to her symptoms.  R. 540.  Kelley did note to Miles on July 24, 2012 that she was "back to feeling nervous," however, Miles indicated in her report that it was possible that Kelley was reporting significantly worse symptoms "due to being denied SSDI [benefits] and wanting a stronger case."  R. 624.  Miles later retracted this statement after being asked by Kelley's lawyer to "address" the discrepancy.  R. 147.  Kelley did not return to see Miles until February 4, 2013 when she reported "doing well and being in a good mood," and presented as "upbeat, smiling and laughing."  R. 680.  Despite this, Miles, at Kelley's urging, completed a long packet from Kelley's disability lawyer "with Kelley's input."  Id.  On these facts, the ALJ found substantial evidence in the record to conclude that there was no logical nexus between the findings recorded in Kelley's treatment records and the diagnosis and restrictions that she and her medical providers alleged.

2.     *The ALJ's Determination of Kelley's Credibility*
       *Was Supported by Substantial Evidence*

Kelley argues that the ALJ failed to evaluate her credibility properly.  D. 12 at 25.  In Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29-30 (1st Cir. 1986), the First Circuit held that an ALJ must consider a subset of factors to analyze a claimant's subjective complaints about pain or other symptoms.  See Hart v. Colvin, No. 16-cv-10690-ADB, 2017 WL 3594258, at *11 (D. Mass. Aug. 21, 2017).  These factors, as also enumerated in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), include: "(1) the nature, location, onset, duration, frequency, radiation and intensity of any pain; (2) [p]recipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) [t]ype, dosage, effectiveness, and adverse side-effects of any pain medication; (4)

[t]reatment, other than medication, for relief of pain; (5) [f]unctional restrictions; and (6) [t]he claimant's daily activities." Avery, 797 F.2d at 29; 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). Although an ALJ should consider each of the above-listed factors, the ALJ is not required to provide "explicit written analysis of each factor." Hart, 2017 WL 3594258, at *11; see Vega v. Astrue, No. 11-cv-10406-WGY, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012). Finally, when reviewing an ALJ's determination of a claimant's credibility on appeal, a reviewing court should give "considerable deference" to a "fact-finder's assessment of a party's credibility." Anderson v. Astrue, 682 F. Supp. 2d 89, 96 (D. Mass. 2010); see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (explaining that it is the responsibility of the ALJ to determine the claimant's credibility and to draw inferences from the record). "The credibility determination by the [ALJ], who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Sanchez, 134 F. Supp. 3d at 618 (quoting Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir.1987)).

Kelley argues the ALJ was incorrect to consider that Kelley was never treated with inpatient psychiatric hospitalization, that Miles indicated at one point that Kelley may have been exaggerating and that Kelley once reported to Pleasants that she was looking for work during the period of her alleged disability. D. 12 at 25-28. In this case, the ALJ's credibility determination is supported by substantial evidence. The ALJ did not discredit Kelley's subjective statements about her mental status because she was not hospitalized. D. 12 at 22. Rather, the ALJ considered the level of treatment Kelley had received, or had not received, in this case as one factor in evaluating her subjective complaints about her alleged disability. 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v). Similarly, the ALJ was not required to dismiss the fact that Miles had reported

on one occasion that Kelley may be exaggerating her symptoms to help her disability claim, or that Miles recommended that Kelley go back to work given her improved condition. See R. 563, 624. Although the ALJ acknowledged that Miles later retracted her suspicions, the ALJ correctly found that there were other inconsistencies in the record that indicated that Kelley's symptoms did not preclude her from working. See R. 48-49, 52, 524, 563, 624. Lastly, the ALJ took into account evidence that showed that Kelley had tried to look for a job during the duration of her alleged disability, and that she had noted on multiple occasions to multiple medical providers about her continued engagement in daily activities, which contrasted with her self-reported capabilities. See R. 164-65, 383-86, 403, 441-44, 536, 663.

### 3. The ALJ Did Not Rely On Flawed Vocational Expert Testimony

Finally, Kelley argues that the ALJ failed to describe all of the mental limitations he found for her in his decision – moderate difficulties with social functioning, concentration, persistence or pace – when presenting a hypothetical to the VE at the hearing. D. 12 at 28-29. In particular, Kelley contends that the hypothetical presented to the VE should have included her limitations in concentrating over a period of time, persisting at tasks or maintaining a particular pace over the course of a workday or workweek. D. 12 at 28. Failing to include a functional limitation in a hypothetical question to a VE may require remand to the ALJ. See Stanley v. Massanari, No. 00-577-JD, 2001 WL 873064, at *5 (D.N.H. July 31, 2001) (remanding where the hypothetical posed to the VE included a limitation that the claimant would require a job with simple instructions, but did not adequately describe her limitations in concentration, persistence or pace); see also Allaire v. Astrue, No. 08–375–P–H, 2009 WL 3336107, at *7 (D. Me. Oct.13, 2009) (holding that the absence of a hypothetical question to the VE that incorporated the ALJ's finding of "moderate difficulties in concentration, persistence and pace" required remand).

Kelley's argument fails here because the hypothetical on which the ALJ relied accurately reflects all of the limitations for which he found support in the record. See Arocho, 670 F.2d at 375 (explaining that "for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities").

Kelley's reliance on the case, Viveiros v. Astrue, No. 10-11902-DJC, 2012 WL 4104794, at *1 (D. Mass. Sept. 19, 2012), is unavailing. D. 12 at 28-29. In Viveiros, the complainant alleged that the ALJ had failed to incorporate his finding of moderate difficulties in concentration, persistence and pace into the RFC assessment and the hypothetical questions to the vocational expert at the complainant's hearing before the ALJ. Viveiros, 2012 WL 4104794, at *1. The court held that although the ALJ had discussed the complainant's ability to perform "simple, routine, repetitive" tasks in a stable work environment, he did not address the complainant's moderate difficulties in concentration, persistence and pace, and therefore, the case must be remanded. Id., at *9. In the instant case, by contrast, the ALJ addressed Kelley's limitations in "maintaining concentration, persistence, and pace" by factoring into his hypothetical to the VE the need for such an individual to take consistent breaks while likely working in "light, unskilled" jobs. R. 97 (explaining to the VE to consider a hypothetical person of the "same age, education, language and work background" as Kelley who would be limited to maintaining concentration, persistence and pace for "two-hour increments over an eight-hour workday"); see Le v. Colvin, No. 3:15-cv-30157-KAR, 2016 WL 7104835, at *12 (D. Mass. Dec. 5, 2016) (explaining that limiting a hypothetical to include only "unskilled work" sufficiently accounts for a claimant's limitations in concentration, persistence or pace when a claimant's medical records show that the claimant can

engage in "simple, routine tasks or unskilled work" (quoting <u>Winschel v. Comm'r of Soc. Sec.</u>, 631 F.3d 1176, 1180 (11th Cir. 2011)).

The ALJ also addressed Kelley's difficulties with social functioning in his RFC assessment and the hypothetical he presented to the VE. R. 99 (asking the VE to consider an individual who was "limited to dealing with only minor changes in the workplace; and who was able to relate to co-workers, supervisors, and the public on a superficial basis"); <u>see</u> <u>Dias v. Colvin</u>, 52 F. Supp. 3d 270, 286–87 (D. Mass. 2014) (concluding that the ALJ did not err by not including any social limitations in his RFC assessment and his hypothetical question to the VE because he referenced that the claimant "could manage basic work related social interactions with her supervisors and coworkers"). Thus, the Court finds that substantial evidence in the record supports the limitations contained in the RFC and the ALJ adequately incorporated the RFC into the hypothetical posed to the VE.

## V. Conclusion

For the foregoing reasons, the Court DENIES Kelley's motions to reverse and remand, D. 11, and GRANTS the Commissioner's motion to affirm, D. 19.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge